UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED by _____ D.C.

OCT 1 9 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

TOM HUBBERT                          :
121 Brownhill Lane                   :
Ringgold, Georgia, 30736             :
          Plaintiff                  :
And                                  :    **Case No.** **12-CV-23829 Cohn/Seltzer**
                                     :
LINDA HUBBERT                        :
121 Brownhill Lane                   :
Ringgold Georgia, 30736              :
          Plaintiff                  :
                                     :
And                                  :
                                     :
BILLY RAY KIDWELL                    :  AT LAW AND IN ADMIRALTY
5064 Silver Bell Drive               :
Port Charlotte, FL. 33948,           :
          Plaintiff                  :  COMPLAINT
                                     :
AND                                  :
                                     :  With JURY DEMAND
TANA KIDWELL                         :
5064 Silver Bell Drive               :
Port Charlotte, FL. 33948,           :
          Plaintiff                  :
                                     :
And                                  :
                                     :
HANNAH KIDWELL                       :
A Minor Child                        :
5064 Silver Bell Drive               :
Port Charlotte, FL. 33948,           :
          Plaintiff                  :
      v.                             :
                                     :
CARNIVAL CORPORATION                 :
DBA Carnival Cruise Lines            :
3655 N.W. 87th Ave.                  :
Miami, Fl. 33178,                    :
          Defendant                  :

## I. COMPLAINT FOR DAMAGES

The five (5) Plaintiff's in this case are proceeding *Pro Se* and seek a very liberal construction of their action pursuant to the doctrine of <u>Haines</u> v. <u>Kerner</u>, 404 U.S. 519 (1972).

The *Pro Se Plaintiff(s)* hereby sue the Defendant and file this Complaint for Damages, and say:

## II. THE PARTIES AND JURISDICTION

1. This is an action seeking damages in excess of $75,000.00, exclusive of interests, costs, and attorney's fees, *if applicable*.

2. Federal Subject Matter Jurisdiction arises under, and is by virtue, of Diversity of Citizenship pursuant to 28 U.S.C. § 1332, as this is a civil action where the matter in controversy exceeds the sum, or value, of $75,000.00, exclusive of interest, and costs, and is between Citizens of different States, and/or Citizens of a State, and Citizens, or Subjects, of a Foreign State, and arises under, and is by virtue of the Admiralty, or Maritime Jurisdiction pursuant to 28 U.S.C. §1333, and is being filed in Federal Court, <u>as requested by the Defendant</u> in the venue selection clause in the Passenger Ticket(s) issued by the Defendant, said venue not being contested by Plaintiffs, and agreed to by all parties.

3. Plaintiff, Tom Hubbard, is a resident of the State of Georgia.

4.  Plaintiff, Linda Hubbard, is a resident of the State of
    Georgia.

5.  Plaintiff, Billy Kidwell, is a resident of the State of
    Florida, and was living in Ringgold, Georgia with his
    Brother, Tom Hubbard, <u>at the time</u> he purchased his
    Passenger Ticket issued by the Defendant, which was
    purchased from the Chattanooga Tennessee AAA.

6.  Plaintiff, Tana Kidwell, is a resident of the State of
    Florida, and was living in Ringgold, Georgia with her
    Brother-In-Law, Tom Hubbard, <u>at the time</u> she purchased her
    Passenger Ticket issued by the Defendant, which was
    purchased from the Chattanooga Tennessee AAA.

7.  Plaintiff, Hannah Kidwell, a minor child, is a resident of
    the State of Florida, and was living in Ringgold, Georgia
    with her Uncle, Tom Hubbard, <u>at the time</u> her father, Billy
    Kidwell, purchased her Passenger Ticket issued by the
    Defendant, which was purchased from the Chattanooga
    Tennessee AAA.

8.  The Defendant, Carnival Corporation, is incorporated in
    Panama, and is authorized to do business in Florida, as a
    foreign For Profit Corporation, and at all times material
    hereto was, and is, doing business in Miami-Dade County,
    Florida.

9.  The Defendant at all times material hereto, personally, or
    through an agent, in the County, and in the District, in
    which this Complaint is filed:

a. Operated, conducted, engaged in, or carried on a business venture in this state, and/or County; and/or

b. Had an office, or agency, in this state, and/or County; and/or

c. Engaged in substantial activity within this state; and/or

d. Committed one, or more, of the acts stated in Florida Statutes, Sections, 48.081, 48.181, or 48.193;

10. All conditions precedent for filing, and maintaining, this action have been fulfilled, have been waived, or do not apply.

### III. JURY TRIAL

Plaintiffs seek a Jury Trial.

### IV. OTHER ALLEGATIONS COMMON TO ALL COUNTS

11. **PASSENGER CONTRACT TICKET FRAUD BY DEFENDANT.** The passenger tickets, which the Defendant alleges are Passenger Contract Tickets, are the "*Fruit*" of Intentional Fraud, Deception, Dishonesty, Fraudulent Business Practices, Fundamental Mistakes, and Misrepresentations by the Defendant, and directly conflict with the binding **Vacation Guarantee**

**CONTRACT** that was knowingly, willingly, and intelligently, agreed to by all parties.

12. The terms of the alleged Passenger Contract Ticket(s), and specifically all terms containing time limits, procedures for filing claims, waivers of rights, and/or privileges, liability limits, and other rights, and privileges, *including the right to file a Class Action Lawsuit*, normally afforded Citizens of the United States, and/or Residents of the State of Florida, is the "*Fruit*" of intentional Fraud by the Defendant, and the actual terms of the Passenger Ticket Contract was concealed from Plaintiff(s), and from the general public, including customers of Defendant, by various means, *such as*;

a. Plaintiff(s) were told to sign stacks of papers containing, and concealing, the alleged Passenger Contract, as part of the Vacation Cruise Procedure, **AFTER** they had entered into a contract with Defendant, and **AFTER** paying the Defendant, **IN FULL**, for the Defendant's Cruise, at issue in this lawsuit.

b. Plaintiff(s) were NOT provided a copy of the alleged Passenger Ticket Contract, *prior* to entering into a business relationship, and/or agreement, with the Defendant, so that they could read the arbitrarily, and capricious, one-sided terms set by the Defendant, that are "*excessively favorable*" to the Defendant, and make an intelligent, willing, and/or knowing decision to enter into such an agreement.

c. The Passenger Ticket "*alleged Contract*" was written in "*Legalese*", *a language specific to Attorneys*, and was so complex that the Plaintiff(s), the General Public, and "*Any Reasonable Person that had not been to law school*" could not understand said Contract.

d. *From what they could understand*, Plaintiff(s) were shocked to find that the Defendant, *in bad faith*, "*appeared*" to want an unfair Passenger Ticket Contract, excessively "*favorable*" to Defendant, requiring Plaintiff(s) to waive many of their Constitutional Rights, and/or, Statutory Rights, denying them fair, and/or honest treatment.

e. Plaintiff(s), believing the Carnival Passenger Ticket Contract was not legal, *or valid*, and believing that a business could not willingly violate laws, such as the Americans with Disabilities Act, and Due Process Guarantees, and force its customers to _unwillingly_ waive all of their rights to the protections of those laws, *thereby waiving the very clear intent of Congress in passing those laws*, as a requirement for doing business with the Defendant, contacted the Defendant seeking clarification, as to the actual terms of the Carnival Passenger Ticket Contract.

f. The Plaintiff(s) contacted the Defendant, _Doing Business As_ Carnival Cruise Lines, and were directed by the Defendant, to the Carnival Cruise Line Web Site for clarification as to the terms of the Carnival Passenger Ticket.

g. The Carnival Cruise Internet Web Site had a link to a page that was supposed to contain the Carnival Cruise Passenger Ticket Contract, however when Plaintiff(s) clicked on the link, **so that they could carefully read, and try to understand the terms of the Carnival Ticket Contract**, a page constantly came up that stated the page sought *"Could not be found on the Carnival Web Page Server"*.

h. Based on the Defendant's Internet Web Site having the *former* conditions of the alleged Carnival Passenger Ticket Contract removed, the Plaintiff(s) assumed, as **"Any Reasonable Person" would**, that the former conditions no longer applied, since the Defendant had made it clear to Plaintiff(s), that the actual terms of the Carnival Cruise Ticket was posted on the Defendant's Internet Carnival Cruise Web Site.

i. Plaintiff's both printed a copy of the Carnival Cruise Internet Web Page stating there was no page containing the Carnival Passenger Cruise Contract, which is attached to this Complaint, and marked attachment 1, and the Plaintiff(s) filmed themselves using the Carnival Cruise Web Site, with NO Carnival Passenger Ticket Contract posted on Carnival's Internet Web Site.

j. It should be noted that nearly a year AFTER the Carnival Cruise at issue in this lawsuit, the Defendant Carnival Cruise Line still has not posted a Public Web Page with the conditions of their alleged Passenger Ticket Contract, which obstructs the public, including Plaintiff(s), in

clarifying the actual terms of the Carnival Passenger Ticket Contract, *if such terms legally exist*.

k. To further intentionally deceive the Plaintiff(s), when Plaintiff(s) contacted the Defendant, ***prior*** to the cruise at issue in this lawsuit, Plaintiff(s) were directed by the Defendant to a prominent page on the Carnival Cruise Public Internet Web Site called "*Triple Protection*" which the Defendant stated was their present binding **Carnival Vacation Guarantee CONTRACT**, a copy of which is attached hereto.

l. The terms of the Carnival Vacation Guarantee **CONTRACT** directly contradicted the terms, and statements, printed on the alleged Carnival Passenger Ticket Contract, and when the Plaintiffs asked the Defendant about the direct conflict they were told "*The Carnival Vacation Guarantee* **CONTRACT** *is completely binding, and is what Carnival goes by*".

m. The failure of Carnival Cruise Line to post a public page on their Internet Web Site, where they do business, and where they did business with the Plaintiff(s) in this case, containing the alleged Carnival Passenger Ticket Contract, denied the Plaintiff(s) a fair opportunity to fully read, and try to understand, the legalese, and actual terms, and/or intent, of the alleged Carnival Passenger Ticket Contract, especially in light of their very prominent, and extremely conspicuous, **POSTED** Carnival Vacation Guarantee **CONTRACT** that directly contradicted the terms, and statements, printed on the alleged Carnival Passenger Ticket.

n. The failure of Carnival Cruise Line to post a public page on their Internet Web Site, where they do business, *and where they did business with the Plaintiff(s) in this case*, containing the alleged Carnival Passenger Ticket Contract, and having Carnival Cruise Line post a very prominent Web Page, *instead*, with what appeared to the general public, appeared to Plaintiff(s), and would appear to "*Any Reasonable Person*", to be the new, replacement **CONTRACT** between Carnival Cruise Line, and its customers, with Carnival's three (3) way exclusive Vacation Guarantee **CONTRACT**, rendered the conflicting Carnival Passenger Ticket Contract **VOID**, ***ab initio***, in its entirety.

o. *At any rate*, under the circumstances described herein, there was never a willing, knowing, or intelligent agreement among the parties, as to the alleged Passenger Ticket Contract, only confusion intentionally caused by the Defendant, and a firm belief by the Plaintiff(s) that the prominent Carnival Vacation Guarantee was the only binding **CONTRACT** between the parties.

p. The Carnival Vacation Guarantee is the only binding **CONTRACT**, and/or Agreement, made between the parties.

13. **DATE OF ILLNESS.** All five (5) Plaintiff(s) were knowingly, and intentionally, subjected to appalling filthy, unsafe, conditions, and a disease-laden ship, with contaminated water, and food, by the Defendant, Carnival Cruise Line, as soon as Plaintiffs boarded the Carnival Legend on October 23, 2011 and continuing to October 30, 2011, the end of their cruise. All five (5) Plaintiff(s) sporadically

suffered extremely severe, Gastrointestinal Illness, and/or
the life-threatening Norovirus[1], for the duration of that
cruise, and for about two weeks thereafter. Although the
five (5) Plaintiffs were still sickly, and suffering,
several weeks to a month after the cruise, their main
illness started on the day of the cruise, October 23, 2011
and lasted till approximately November 9, 2011, about a
week, and a half, to two weeks, after the cruise.

14. **LOCATION OF ILLNESS.** This illness occurred on the vessel
Carnival Legend, a ship in navigable water, while all five
(5) Plaintiff(s) were aboard, *as passengers*, from October
23, 2011 to October 30, 2011 on a cruise. Accordingly the
Plaintiff(s) Claims are governed by General Maritime Law.

15. **STATUS OF PLAINTIFF(S) AS OF DATE AND TIME OF ILLNESS.** At
all times material hereto the five (5) Plaintiffs were
passengers on the subject cruise ship described herein, and
accordingly, were invitees while on the vessel. Plaintiffs
are not in possession of their Passenger Tickets. The
Defendant is in possession of their Passenger Tickets, or
facsimiles thereof.

---

[1] According to the United States Center for Disease Control the Norovirus is
responsible for about 70,000 hospitalizations, and 800 deaths each year.

16. **CARNIVAL CORPORATION POLICY OF FRAUD IN UNITED STATES CENTER FOR DISEASE CONTROL, VESSEL SANITATION PROGRAM, CONTRIBUTED TO ILLNESS PLAINTIFF(S) SUFFERED.** The United States Center for Disease Control[2] is entrusted with enforcing the Public Health Service Act, 42 U.S.C. Section 264, to assure foreign ships at American Ports are safe for passengers, and that those ships do not pose a health risk for major cities, and attempts to accomplish this goal with its Vessel Sanitation Program, and Vessel Inspections twice a year on the Carnival Legend, the Vessel at issue in this lawsuit. The Carnival Corporation has a *"Policy of Fraud"* in the administration of the CDC Vessel Sanitation Program as described below. This fraudulent policy contributed to the illness Plaintiff(s) suffered.

### *The Fraud*

a. Every six (6) months the CDC inspects the Carnival Legend pursuant to the CDC Vessel Sanitation Program.

b. Each inspection usually finds numerous defaults, usually a number of which that pose serious health threats to passengers on the ship, and a health threat to the cities, where the Carnival Legend is docked.

c. The Carnival Legend is constantly on the go, making money, coming in to port at Tampa on Sunday, unloading passengers, staying at dock in Tampa for a couple of hours

---

[2] The United States Center for Disease Control is hereinafter referred to as simply the "CDC".

as the onboard passengers debark, and while the ship is re-stocked with supplies, cleaned, meals cooked, and new passengers for the next cruise are processed in, with their luggage.

d. The task of processing two thousand, one hundred, and twenty-four (2,124) passengers off a full Carnival Legend, with their luggage, which is in the area at least six thousand (6,000) pieces of luggage, doing substantial paperwork for each passenger, and then processing two thousand one hundred and twenty-four (2,124) passengers back on the ship with another six thousand (6,000) pieces of luggage, and more massive amounts of paperwork, all while cleaning cabins for those passengers, doing laundry for the beds, cleaning common areas, kitchens, as cooks, waiters, and food service help prepare meals for the 2,124 new passengers, while re-stocking the ship for the new cruise, and doing many other necessary tasks not listed here, requires every single one of the ship's 900 man crew, during the short period of time the Carnival is at port on Sundays, and makes it impossible for the Defendant to address the defects, and attempt to fix the many defects found during the CDC inspection.

e. The procedure is that the CDC will pull an inspection every six months pursuant to the CDC Vessel Sanitation Program, during the extremely short time the Carnival Legend is at port, with all the ship's man-power being used as described in section d above. A couple of hours *after* the inspection the Captain will send a fraudulent e-mail to the CDC, falsely claiming that all the health defects had been corrected, or addressed somehow, so that the CDC will

amend the inspection report, and give the ship a higher
score then it deserves, allowing the ship to continue to
make a massive profit, while endangering passengers, and
the port at the city of Tampa.

f. No person of reasonable intelligence, or sound mind,
knowing the massive task of disembarking such a large
number of passengers, and taking on just as many new
passengers, while cleaning the ship, fixing meals, re-
stocking for the new cruise, and so on would ever believe
that the defects were fixing during that same time period,
on a Sunday which it is next to impossible to get parts to
test water, fix dishwashing machines, and so on.

g. The falsifying of Federal CDC Inspection Records is an
act of Obstruction to a Federal Agency, and a violation of
several Federal Criminal Laws, and contributed to the
illness the Plaintiff's suffered, as described herein.

17. **CARNIVAL CORPORATION INTENTIONAL VIOLATIONS OF VSP 2011
OPERATIONS MANUAL CONTRIBUTED TOWARD ILLNESS PLAINTIFF(S)
SUFFERED** The CDC Vessel Sanitation Fraud by Carnival
Corporation, as described in section Sixteen (16) above,
violated the CDC VSP 2011 Operations Manual and contributed
to Plaintiff's illness.

18. **CARNIVAL CORPORATION INTENTIONAL VIOLATION OF THE WORLD
HEALTH ORGANIZATION'S GUIDE TO SHIP SANITATION CONTRIBUTED
TOWARDS ILLNESS ALL FIVE (5) PLAINTIFF(S) SUFFERED** The CDC
Vessel Sanitation Fraud by Carnival Corporation, as

-13-

described in section Sixteen (16) above, violated the World
Health Organization's International Health Regulations,
Guide to Ship Sanitation, nearly in its entirety, which
contributed to Plaintiff's illness.

19. **CARNIVAL CORPORATION'S INTENTIONAL VIOLATION OF THE UNITED
STATES FOOD AND DRUG ADMINISTRATION'S MODEL CODE FOR FOOD
SERVICE CONTRIBUTED TOWARDS ILLNESS ALL FIVE (5)
PLAINTIFF'S SUFFERED** The CDC Vessel Sanitation Fraud by
Carnival Corporation, as described in section Sixteen (16)
above, violated the Food and Drug Administration's Model
Code for Food Service, which contributed to Plaintiff's
illness.

20. **CARNIVAL CORPORATION'S POLICY OF NOT TIMELY REPORTING
GASTROINTESTINAL ILLNESS BY SHIP EMPLOYEES CONTRIBUTED
TOWARDS ILLNESS ALL FIVE (5) PLAINTIFF'S SUFFERED** The CDC
requires that all Gastrointestinal Illnesses be reported to
the CDC. The CDC Vessel Sanitation Inspection on October 9,
2011, prior to Plaintiff(s) Cruise, exposed that the
Defendant, Carnival Corporation, did not report, and did
conceal, Gastrointestinal Illness by at least one Carnival
Legend Employee from the CDC, which concealed that there
was Gastrointestinal Illnesses on the Carnival Legend, and
denied Plaintiff(s) the right to decide if they wanted to
cruise on a ship with a documented case of said illness.

21. **CARNIVAL CORPORATION'S POLICY OF TELLING PASSENGERS WITH
GASTROINTESTINAL ILLNESS SYMPTOMS THAT THEY ARE MERELY SEA
SICK, AND SELLING SEA SICK PILLS TO THEM, CONTRIBUTED
TOWARDS ILLNESS ALL FIVE (5) PLAINTIFF'S SUFFERED** The CDC

requires that all Gastrointestinal Illnesses be reported to the CDC. To enhance their profits, and avoid reporting symptoms of Gastrointestinal Illness to the CDC, and thereby concealing such illness from the public, Carnival Corporation has a policy of telling passengers with symptoms of a Gastrointestinal Illness that they are merely Sea Sick, and then selling the sick passenger Sea Sick Pills, as occurred in this case.

22. **DESCRIPTION OF THE ILLNESS AND RELATED FACTS.** The Defendant Cruise Line, Carnival Corporation, owns, and operates, the cruise ship, *Carnival Legend*. Carnival Corporation, through its employees on the Carnival Legend failed to maintain the ship, and allowed the potable water supply for the Carnival Legend to become contaminated, and unsafe, and unfit, for human consummation, and then knowing that the potable water was unsafe, and posed an extremely serious health risk, concealed from the passengers, including Plaintiff(s), that the water was unfit, and unsafe, for humans, and knowing said water could cause grave, and even life-threatening illness to Plaintiff(s), gave said contaminated water to Plaintiff(s) to drink.

23. On October 9, 2011, exactly two (2) weeks before the Plaintiff(s) went on their cruise; the Carnival Legend was inspected by the CDC, under the authority of the Public Health Act 42 U.S.C. Section 264, pursuant to the **CDC Vessel Sanitation Program.**

The CDC Vessel Sanitation Inspection found;

a. That at least one employee on the Carnival Legion worked at a bar on the ship, constantly vomiting, for her complete shift, with a severe Gastrointestinal Illness, and symptoms of the Norovirus, contacting untold numbers of passengers.

b. That the ship's potable water supply tested positive for Coliforms that could indicate the presence of harmful, disease-causing organisms, including e-coli.

c. That the Carnival Legend's Potable Water Test Results for e-coli were strangely "*missing*" from the ship's records, and the ship personnel did not know if the ship's drinking water had tested positive for e-coli, or not.

d. The CDC Vessel Sanitation Inspection found at least five (5) separate, extremely serious deficiencies as to the Recreational Water Facilities, so severe that the CDC recommended that the Recreational Water Facilities be immediately closed, due to the extremely substantial health threat they posed to the ship's passengers.

e. The CDC Inspection revealed that many of the ship's dishwashers, either did not wash, or did not rinse, resulting in most of the ship's dishes, and cooking pans, not be properly cleaned, nor safe for human use, endangering passengers including Plaintiff(s).

f. The CDC Inspection found the main galley dishwasher had fully clogged rinse spray nozzles, and therefore could not rinse any of the dishes, leaving filth, and soap products

on dishes, while the dishwasher's digital thermometer was defective, resulting in the water being at least 12 degrees below the required temperature, considered safe, for washing dishes on a ship.

g. The CDC Inspection found the main galley dishwasher, *after the final rinse*, had a massive amount of filth on the machine, far in excess of what could build up in a day.

h. The CDC Inspection found that the room service dishwasher produced NO SPRAY AT ALL to rinse dishes, leaving all the room service dishes filthy, and not rinsed.

i. The CDC Inspection found the Lido Galley Dishwasher, was encrusted with heavy amounts of filth, which would contaminate the dishes being washed.

j. The CDC Inspection found **AT LEAST THREE POT WASHING MACHINES WERE IN SIGNIFICANT DISREPAIR**, and there was a massive amount of soiled pots, and filth, in the main galley.

k. The CDC Inspection found the coffee shop was filthy, there was mold, massive amounts of filth everywhere in food areas, fridges did not cool, and had leaking doors, food had unknown filth dripping on it, hand washing areas had layers of filth on paper towel machines, sinks did not operate, so food service employees on the ship could not wash their hands.

l. It would take dozens of pages to describe all the filth, and health threats found by the CDC inspection. Simply put

the Carnival Legend was not fit, ***nor safe***, for humans, and was in such a state of filth, and disrepair that it would take weeks, just to get parts to fix all the defective equipment.

m. Despite all this, the Captain sent a fraudulent e-mail to the CDC, *shortly after the inspection*, falsely claiming most of the health issues had been resolved, while knowing the ship had not been properly cleaned, and repaired, and was still unfit, **and extremely unsafe**, for humans, posing a very substantial health risk, that contributed to, **and caused**, the five (5) Plaintiff's illness.

n. As a result of the contaminated, unsafe, potable water, the contaminated, unsafe, recreational water, the filth all over the Carnival Legend, the filth in food storage areas, massive filth in the food preparation areas, the dishes being filthy, and either not properly washed, or not rinsed, the pots not being properly washed, or rinsed, and the other filth described in the Carnival Legend Inspection CDC Vessel Sanitation Program Inspection of October 9, 2011, and/or, having at least one ship employee work while sick spreading the Gastrointestinal Illness, all five Plaintiffs got extremely ill with a severe Gastrointestinal Illness, and symptoms of the Norovirus, that sporadically lasted for the duration of the week cruise, and for approximately two weeks after the cruise.

o. Plaintiff Tom Hubbard is elderly, with cancer, a bad heart, and other disabilities, and the extremely severe Gastrointestinal Illness aggravated Tom Hubbard's disabilities, endangering his life, making him more sick

than he can remember, suffering extreme physical pain, and massive emotional, and mental distress, sporadically for the duration of the week cruise, and for two weeks thereafter.

p. Plaintiff Linda Hubbard is elderly, with a bad heart, and other disabilities, and the extremely severe Gastrointestinal Illness aggravated Linda Hubbard's disabilities, endangering her life, making her more sick than she can remember, suffering extreme physical pain, and massive emotional, and mental distress, sporadically for the duration of the week cruise, and for two weeks thereafter.

q. Plaintiff Billy Kidwell is an elderly, 100% Service-Connected Disabled Veteran with a severe nerve disorder, a bad heart, a history of Life-Threatening Stress-Caused Heart Attacks, a history of bleeding ulcers, and an Aortic Aneurysm. The Gastrointestinal Illness caused the most violent vomiting Plaintiff has every experienced in his sixty three years, constantly endangering his life by aggravating Plaintiff's Life-Threatening Disabilities, and could have caused Plaintiff Billy Kidwell's Aortic Aneurysm to burst, killing him. Billy Kidwell suffered extreme physical pain, and massive emotional, and mental distress, sporadically for the duration of the week cruise, and for two weeks thereafter.

r. Plaintiff Tana Kidwell suffered the extreme severe Gastrointestinal Illness, which made her sicker than she can remember, suffering extreme physical pain, and massive

emotional, and mental, distress, sporadically for the duration of the week cruise, and for two weeks thereafter.

s. Plaintiff Hannah Kidwell, a minor child, suffered an extremely severe Gastrointestinal Illness, which made her sicker than she can remember, suffering extreme physical pain, and massive emotional, and mental, distress, sporadically for the duration of the week cruise, and for two weeks thereafter.

t. All five Plaintiffs suffered loss of the enjoyment of the vacation cruise that they had paid Defendant for, including loss of all related expenses, and loss of their vacation time.

## V. COUNT 1

### PASSENGER CONTRACT TICKET FRAUD BY DEFENDANT

24. The Plaintiffs, Tom Hubbert, Linda Hubbert, Billy Kidwell, Tana Kidwell, and Hannah Kidwell hereby adopt, and re-allege, each, and every allegation in paragraphs 1 through 23, above.

25. **DUTIES OWED BY THE DEFENDANT**. The Defendant owed a duty to each of the named Plaintiffs to post a true, and correct, copy of any alleged Passenger Ticket Contract on its public internet website, where Plaintiffs did business with the Defendant, and breached those duties by failing to provide same.

26. The Defendant, knowing that the <u>binding</u> **Vacation Guarantee CONTRACT**, conspicuously posted on Defendant's Internet Website, directly conflicted with Defendant's alleged Passenger Ticket Contract had a duty to clarify, and resolve all conflicts between the Vacation Guarantee Contract, and any alleged Passenger Ticket Contract, so that the Plaintiffs, and the Defendant, were fully aware of, and in agreement, as to the terms of any Passenger Ticket Contract between the parties. **The Defendant breached this duty, therefore there was no valid Passenger Ticket Contract.**

27. The Defendant had a duty to deal honestly with its customers, and specifically violated that duty by highly advertising, and conspicuously posting on the Carnival Cruise Line's Internet Website, that Carnival has the best Warranty in the business, specifically claiming that Carnival will refund money to passengers, if the passenger is not happy with their cruise, *for any reason*, and then the Defendant refused to honor his highly advertised Vacation Warranty, and told the Plaintiffs, *after their cruise*, that the Carnival Cruise Vacation Warranty is not binding, because of an alleged Carnival Passenger Ticket Contract that contradicts the Defendant's Vacation Warranty.

28. Such conduct is a Fraudulent Business Practice, *pursuant to Florida Law*, and is dishonest, and directly violates well-settled contract law, and basic fairness requiring that Contracts be willingly, knowingly, and intelligently made among the parties.

29. As a result of Defendant's Passenger Ticket Fraud each of the Plaintiffs were swindled out of the cost of their cruise, swindled out of the enjoyment of their vacation, and forced to suffer an extremely dangerous cruise, in a hurricane, with ports patrolled by armed Mexican Military, and on a ship so filthy, and unfit for humans, that it posed a major health threat to Plaintiffs, causing them substantial illness, and other harm, as described herein.

## VI. COUNT 2
## VACATION WARRANTY FRAUD BY DEFENDANT

30. The Defendant, Carnival Cruise Line, and Plaintiff(s) both **AGREED** to the terms of the Carnival Vacation Warranty stating that if for any reason the Plaintiffs were not happy with their cruise, that they could notify Carnival at the ship's information desk, prior to arrival at the first Port of Call, debark, and Defendant would refund the unused portion of the fare, and pay for the flight back to Tampa.

31. The Defendant, Carnival Corporation, violated their Vacation Warranty Contract and had the ship's information desk closed prior to arrival at the first port, and if said desk was open, it was only open sporadically, since the ship's information desk was closed each time Plaintiffs attempted to invoke the Defendant's alleged Vacation Warranty, prior to arrival at the first port.

32. Plaintiff(s) did notify Defendant at the main desk that they sought to invoke the Vacation Warranty, and were informed that Carnival would not honor the warranty because

the ship was canceling arriving at the first port due to
the first port being under a hurricane watch, and all
airports were closed due to a Tropical Storm, and/or
Hurricane Watch.

33. The Defendant knew when the Carnival Legend was leaving
the Port of Tampa that a hurricane was predicted to hit the
ship's Ports of Call, and the Defendant intentionally did
not advise the passengers, *including Plaintiffs*, violating
the Defendant's duty to make Plaintiff(s) aware of possible
dangers, and rough seas, especially since most of the
Plaintiffs are elderly, and in extremely poor health, and
rough seas could harm them, and would surely endanger them.

34. The Defendant, knowing that in the least the ship would
be sailing into extremely rough waters, where a hurricane
was predicted to be, failed in his duty to make the
elderly, disabled Plaintiffs, and the Plaintiff Parents of
the Minor Child Plaintiff, Hannah Kidwell, aware of the
extremely high risk of danger, injury, and/or illness,
posed by having a cruise ship, *The Carnival Legend*, that
has a history of mishaps, including almost capsizing during
fair weather, sail into to path of a predicted major
hurricane, and failed to give the Plaintiffs the option to
decide if they wanted to subject themselves to such danger,
for a vacation.

35. The Defendant had a duty, and is in breach of the duty,
to announce to the passengers, prior to leaving port, that
the weather bureau had predicted that a major hurricane
would directly hit the ship's scheduled ports of call, and
that the seas, *in all probability*, would be extremely

rough, and that the elderly, the disabled, and those with minor children should consider those factors before deciding to leave the safety of the Port of Tampa.

36. The facts in paragraphs 30 to 35 above prove that the Defendant had no intent of abiding by the Defendant's Own Vacation Warranty, and Defendant intentionally violated, and breached said warranty, causing substantial harm to Plaintiffs, including the cost of their cruise vacation, the costs of a flight for Plaintiffs from Mexico to Tampa, and all related vacation costs.

## VII. COUNT 3

## CENTER FOR DISEASE CONTROL VESSEL SANITATION PROGRAM FRAUD BY DEFENDANT

30. The Defendant, Carnival Cruise Line, did engage in intentional fraud in the Center for Disease Control Vessel Sanitation Program as described in paragraphs 16 to 23 above.

31. The Defendant had a duty to exercise reasonable care for the safety of its passengers, including the named Plaintiffs. See Hall v. Royal Caribbean Cruises, Limited, 2004 A.M.C. 1913, 2004 WL 1621209, 29 FLWD 1672, Case No. 3D03-2132 (Fla. 3d DCA Opinion filed July 21, 2004).

32. That duty includes maintaining a clean, safe ship for passengers, and fully complying with the Center for Disease Control Vessel Sanitation Program, including fully correcting any health risks found, and not subjecting

passengers, including Plaintiffs, to those known health risks.

33. The Defendant failed in that duty, and fully knowing that the potable drinking water had tested positive for Coliforms, and knowing that the ships potable water did not have a record of a test for E-Coli, and knowing it was dangerous, and unsafe to give the ships water to passengers under such conditions, the Defendant did, with a complete reckless disregard for the safety of Plaintiffs, provide them with this unsafe, contaminated, ship's water to drink for a week, while fully aware there was a strong probability of making Plaintiff's deathly ill.

34. The Defendant knowingly utilized negligent methods of providing potable water, negligent methods of providing food services, negligent methods of providing recreational water, and Defendant knew, from the recent CDC Inspection Report, that the food, water, and ships facilities were not safe, nor fit, for humans, and had an extremely strong likihood of harming Plaintiffs, and/or causing extremely severe, dangerous, and often Life-Threatening, Gastrointestinal Illness.

35. The CDC Inspection Fraud by Defendant, and the filthy, unsafe Carnival Legend Ship Conditions, is an ongoing, reoccurring, continuous, and/or repetitive problem.

36. The Defendant's Intentional Fraud in the Center for Disease Control Vessel Sanitation Program caused the Plaintiffs to be Deathly-Ill sporadically for the entire cruise, and roughly for two weeks after the cruise.

## VIII. COUNT 4

## NEGLIGENCE CAUSING PLAINTIFFS ILLNESS

37. The Plaintiffs, Tom Hubbert, Linda Hubbert, Billy Kidwell, Tana Kidwell, and Hannah Kidwell hereby adopt, and re-allege, each, and every allegation in paragraphs 1 through 36, above.

38. Defendant, Carnival Cruise Line, had a duty to provide a safe, clean, sanitary ship fit for passengers, and as described herein intentionally breached that duty in a quest for unreasonable profits, knowingly endangering, and harming, the Plaintiffs by subjecting them to a ship that was so filthy, contaminated, and unsafe, that humans should not be allowed to drink the water, eat the food, or use the facilities on said ship, until it is cleaned up, and properly repaired, and made fit for human use.

39. The extremely filthy, unsafe conditions described in this Complaint caused Plaintiffs to suffer an extremely horrible, painful, Gastrointestinal Illness with the most painful, and violent vomiting any of the Plaintiffs have experienced in their lives.

40. The Defendant had actual knowledge of the extremely filthy, unsafe, and unfit for human conditions, on the Carnival Legend, and intentionally, and with the intent to defraud the Plaintiffs, and other passengers, out of their money made little, or no attempt to correct the defects, or to provide Plaintiffs with a safe ship, with water fit, and safe to drink, food that was properly stored, prepared, and

safe to eat, and dishes, that were properly washed, and rinsed, and therefore safe for Plaintiff to eat off of.

41. As a result of Defendant's intentional negligence the Plaintiffs suffered bodily injury, in the form of an extreme Gastrointestinal Illnesses, with vomiting so severe that it aggravated the Disabled, and Elderly, Plaintiff's Disabilities, resulting in extreme pain, and suffering for all the Plaintiffs, mental anguish, loss of enjoyment of life for the duration of their vacation, and for about two weeks afterward, and permanent, horrific, memories of their terrible, torturous experience.

## IX. COUNT 5

## NEGLIGENCE CAUSING THIEF OF PLAINTIFF'S PROPERTY

37. The Defendant had a sale where watches, jewelry, and other items, many of which the Defendant claimed were worth over a hundred dollars, were sold for a set time period in one of the stores on the Carnival Legend.

38. The Plaintiff, Billy Kidwell, and his wife, Tana Kidwell, each purchased around three hundred dollars' worth of the ten dollar ($10.00) sale items, spending over six hundred dollars ($600), on items that the Defendant claimed were worth up to a hundred dollars, or more, each and placed the large bags of items they purchased from Defendant, in their luggage in their locked room, because they would not fit in the room safe.

39. The only party that had a key to the Kidwell's room on the Carnival Legend was employees of the Defendant.

40. When getting ready to disembark the Kidwell Plaintiffs discovered that the large bags of items they purchased from the Defendant, and a number of items they had purchased in Belize, and Mexico worth in the area of another $700 to $800 was missing from their room, and had been stolen by employees for Defendant, since **only** the Defendant had access to their room.

41. Plaintiff, Billy Kidwell, went to the ship's desk to report the thief and was told by the Defendant that the ship's employees were all busy disembarking passengers, that Kidwell should write Carnival and report the thief when he got home.

42. As soon as he got home Plaintiff was extremely ill but still promptly e-mailed Carnival, and followed up with letters, complaining about being robbed by the Defendant.

43. Carnival responded that because the Defendant's Employees on the Carnival Legend refused to take a report there was no record of the robbery, and therefore, in essence they would keep the items they stole from Plaintiff, and make no effort to pay Plaintiff for his loss.

44. The Defendant knows, *beyond any doubt*, that Defendant's Employees robbed Plaintiff, and the Defendant has a policy of Acting in Bad Faith.

## X. PUNITIVE DAMAGES

37. The Defendant's conduct in this case is so offensive, reckless, and offensive to all standards of human decency that Punitive Damages are required to punish, and deter, this outrageous conduct.

38. *As exposed in the instant case*, the Defendant, with his total, reckless disregard for not just the safety of thousands of Cruise Ship Passengers, but the very real threat Defendant poses to major Port Cities in Florida, such as Tampa, or Miami, where the Defendant's Filthy, Disease-Laden Ships constantly come to Port, DEMANDS that this Court not only award Punitive Damages, but DEMAND that this Court award Substantial, and Sufficient, Punitive Damages to get the Defendant's Attention, and thereby DETER Defendant before the Defendant harms a whole ship, consisting of thousands of passengers, including minor children, and/or Defendant contaminates a whole Port City, like Tampa, or Miami, Florida with a contagious disease.

39. It should be noted that two, and three, million dollar awards by this Court have not deterred, *in the least*, the Defendant's wrongful conduct, or had even minimal effect in causing the Defendant to make his ships safe, or cause Defendant to change his wrongful practices, and that it will take realistic, and **Very Substantial**, Punitive Damages, *at least in the tens of millions of dollars*, to get this extremely wealthy Defendant to deter from similar, future, wrongful conduct that endangers not just thousands of passengers on Defendant's Disease-Laden Ships, but poses a very real threat to major American Port Cities.

**WHEREFORE**, Plaintiffs demand judgment against the Defendant for Damages suffered as a result of the intentional wrongful conduct of Defendant, described herein, resulting in Plaintiffs suffering bodily pain, suffering, extreme illness, mental anguish, aggravation of disabilities, loss of enjoyment of life, loss of their vacation, and related damages, the thief of their property, the loss of rights, Contract Fraud, and other wrongful acts, and damages as described herein.

Plaintiffs seek judgment that the Defendant's alleged Passenger Cruise Ticket Contract directly conflicts with the Defendant's Vacation Warranty Contract, and is not intelligently, willingly, or knowingly made, and under the circumstances is **NOT** valid.

Plaintiffs seek judgment that the Defendant is engaged in fraud as to the CDC Vessel Sanitation Program, and that said violations endangered Plaintiffs, contributed to their illness.

Plaintiffs seek for the Court to **Pro Bono Publico** find that Defendant's violations endanger not just thousands of cruise passengers, including Plaintiffs, but endangers whole, major American Port Cities.

Plaintiffs seek Punitive Damages of **not less than ten million dollars each** to deter similar future outrageous conduct by Defendant, and to protect Plaintiffs, and major American Port Cities such as Tampa, and Miami Florida that

Plaintiffs often visit, from Defendant's especially offensive, and reckless behavior.

Plaintiffs seek any, and all, other damages that they are legally entitled to.


Respectfully submitted,


Tom Hubbert, *Pro Se*                    August 16, 2012


Linda Hubbert, *Pro Se*                  August 16, 2012


Billy Kidwell, *Pro Se*                  August 16, 2012


Tana Kidwell, *Pro Se*                   August 16, 2012


Hannah Kidwell, *Pro Se*                 August 16, 2012

ATTACHMENT ONE

THE CARNIVAL VACATION GUARANTEE WARRANTY



Welcome back,  Billy    Not Billy

**1.800.764.7419**

**COMMUNITY**    **HELP**    Search Carnival.com

| PLAN & BOOK | EXPLORE | MANAGE | SPECIAL |  JOIN |
|---|---|---|---|---|
| your cruise | Carnival cruising | my cruise | offers | the VIFP Club |



## THREE WAYS TO PUT YOUR MIND AT EASE

Includes "Cancel for Any Reason" protection and many other valuable benefits

When it comes to fun, Carnival's got you covered for a worry-free vacation. Carnival protects you before, during and after your cruise with the greatest program in the entire cruise industry.

Introducing Carnival's triple protection plan:

• Carnival's exclusive Vacation Guarantee: The only money-back guarantee offered in the cruise industry.

• Cruise Vacation Protection Plan

• Carnival's Travel Hotline: The only 24-hour help service in the cruise industry 1-877-TVL-HTLN (1-877-885-4856) or 1-305-406-4779.

How can we help?

**›  FUNVILLE:**
Where's all the fun live?
Right here.  view

**›  Plan your cruise:**
Start planning your perfect cruise now.
view

**›  Sign up for Specials:**
Searching for more cruise deals?
Don't worry, we deliver.
Sign up for specials.

---

**Already Booked**

Manage My Cruises

Airport Transfers

Gifts & Services

Hotel Packages

**Book A Cruise**

All About Cruising

Booking Options

Specials

Find a Travel Agent

Vacation Protection

**Group Travel**

Contact A Group Planner

Group Shore Excursions

Charters, Meetings & Incentives

Weddings & Occasions

**Special Offers**

All Specials

Close-To-Home Cruises

Early Saver Specials

VIFP Club Offers

Carnival Australia

**Customer Service**

Carnival FAQs

Contact Us

Cruise Reviews

Support Forums

Embarkation Information

Guests With Special Needs

Cruise Ticket Contract Terms

**About Carnival**

News

Press/Media

Video Center

St Jude

Carnival Foundation

Safety Policy

Sustainability

Investor Relations

World's Leading Cruise Lines

About Carnival    Legal Notices    Privacy Policy    Careers    Press / Media    Travel Partners

**FUN FOR ALL. ALL FOR FUN.**®    Like

© 2012 Carnival Cruise Lines
All rights reserved.

* The company reserves the right to reinstate the fuel supplement for all guests at up to $9 per person per day
if the NYMEX oil price exceeds $70 per barrel. View terms and conditions

ATTACHMENT TWO

THE OCTOBER 9, 2011 CENTER FOR DISEASE CONTROL

VESSEL SANITATION PROGRAM INSPECTION FOR THE

CARNIVAL LEGEND



Centers for Disease Control and Prevention   **Vessel Sanitation**
CDC 24/7. Saving Lives. Protecting People.™    **Program**

## Inspection Detail Report

Advanced Search | Ship Scored 100 | Green Sheet | CDC Home | VSP Home

**Cruise Ship:** Carnival Legend    **Cruise Line:** Carnival Cruise Lines, Inc.    **Inspection Date:** 10/09/2011    **Inspection Score:** 97

This cruise ship inspection report lists the deficiencies found during the inspection. Additional information corresponding to each item number is available in the lastest editions of the CDC ***VSP Operational Manual.***

View/Print Summary Report | View/Print Corrective Action Statement

**Item No.:** 06

**Site:** Potable Water-Monthly Microbiological Sampling Records

**Violation:** On 28 August 2011 a potable water sample tested positive for coliforms but there was no documented result for E. Coli testing. The staff stated that they did the check for the presence of E. Coli but the result was not recorded. It was unclear if the test was positive or negative for the presence of E. Coli.

**Recommendation:** Ensure to document the results for presence of E. Coli in samples positive for coliforms.

**Item No.:** 09

**Site:** Recreational Water Facilities-

**Violation:** The pH levels for the swimming pools were not documented.

**Recommendation:** Maintain the pH level in all RWFs between 7.0 and 7.8. Immediately close facilities if these halogen and pH ranges are not maintained.

**Item No.:** 10

**Site:** Recreational Water Facilities-Automated Free Halogen Residual and pH Testing

**Violation:** There were no chart recorders or electronic data loggers with security features that record pH and halogen measurements for each individual recreational water facilities.

**Recommendation:** Install chart recorders or electronic data loggers with security features that record pH and halogen measurements for each individual RWF. Ensure the sample line for the analyzer probe (monitoring) is either directly from the RWF or on the return line from each RWF and before the compensation tank. Install appropriate sample taps for analyzer calibration. In the event of equipment failure, measure free residual halogen and pH by a manual test kit at the RWF or return line at least hourly for whirlpool spas, spa pools, children's pools, and wading pools and every 4 hours for all other RWFs. Record manual readings on a chart or log, retain for at least 12 months, and ensure that they are available for review during inspections. Complete repairs on malfunctioning halogen analyzer-chart recorders within 30 days of equipment failure. Provide an audible alarm in a continuously occupied watch station to indicate low and high free halogen and pH readings in each RWF.

**Item No.:** 10

**Site:** Recreational Water Facilities-General Recreational Water Facilities Signs

**Violation:** The signs for all recreational water facilities did not include the following words: 'Do not

use these facilities if you are experiencing diarrhea, vomiting, or fever' and 'Bather load #'.

**Recommendation:** Ensure the signs include the following words: (1) do not use these facilities if you are experiencing diarrhea, vomiting, or fever; (4) bather load #.

### Item No.: 10

**Site:** Recreational Water Facilities-Hair and Lint Strainer Cleaning Records

**Violation:** There were no records for the cleaning, rinsing, and disinfection of hair and lint strainers and lint strainer housing for all recreational water facilities.

**Recommendation:** Clean, rinse, and disinfect the hair and lint strainer and hair and lint strainer housing on all RWFs weekly. Ensure disinfection is accomplished with an appropriate halogen-based disinfectant. At a minimum, use a 50-ppm solution for 1 minute, or equivalent CT value. Maintain records on all inspection and cleaning procedures.

### Item No.: 10

**Site:** Recreational Water Facilities-

**Violation:** A test kit for testing the water quality parameter of total alkalinity was not available onboard.

**Recommendation:** Ensure a test kit is available for testing water quality parameters, including total alkalinity.

### Item No.: 11

**Site:** Medical-Crew Gastrointestinal Illness Reporting

**Violation:** The review of the gastrointestinal illness (GI) logs for the last 5 cruises revealed that there was a barista who experienced GI symptoms and continued to work after those symptoms began. Specifically, she reported to experience 3 vomit episodes and headaches with an onset of symptoms on 6 September 2011 at 1329 but reported to the medical center on 7 September 2011 at 1400. She worked her shift on 6 September 2011 but did not work on 7 September 2011. Her whereabouts from the time she sighed off to the time she reported to the medical center were unknown.

**Recommendation:** Ensure that employees having gastrointestinal (GI) symptoms do not go to work and report to the medical center as soon as having their first GI symptom.

### Item No.: 16

**Site:** Food Service General-Consumer Advisory

**Violation:** Ensure that for each restaurant the menu's used have notations at each animal food which is served by order or by recipe in a raw, undercooked or processed way to advise consumers of the elevated risk of consuming such foods. In food outlets either a sign, placard, menu or other written method at the location should be used.

**Recommendation:** If an animal food such as beef, eggs, fish, lamb, milk, pork, poultry, or shellfish that is raw, undercooked, or not otherwise processed to eliminate pathogens is offered in a ready-to-eat form or as a raw ingredient in another ready-to-eat food, ensure the consumer is informed by way of disclosure using menu advisories, placards, or other easily visible written means of the significantly increased risk to certain especially vulnerable consumers eating such foods in raw or undercooked form. Locate the advisory at the outlets where these types of food are served. Ensure that raw shell egg preparations are not used in uncooked products as described in section 7.3.3.2.3. Ensure that disclosure is made by one of the two following methods: (1) On a sign describing the animal-derived foods (e.g., ?oysters on the half-shell,? ?hamburgers,? ?steaks,? or ? eggs?); AND that they can be cooked to order and may be served raw or undercooked; AND a statement indicating that consuming raw or undercooked meats, seafood, shellfish, eggs, milk, poultry may increase your risk for foodborne illness, especially if you have certain medical conditions. Ensure the advisory is posted at the specific station where the food is served raw, undercooked, or cooked to order OR (2) On a menu using an asterisk at the animal-derived foods

requiring disclosure and a footnote with a statement indicating that consuming raw or undercooked meats, seafood, shellfish, eggs, milk, or poultry may increase your risk for foodborne illness, especially if you have certain medical conditions.

**Item No.:** 16

**Site:** Food Service General-Time Control Plans

**Violation:** There was a mixture of the required elements on all the time as a public health control plans in the various galleys and food outlets throughout the ship. Galley plans contained a mixture of galley specific equipment on time control and dining room or buffet area equipment on time control. Restaurant pantries on decks 2 and 3 did not have the bain marie (soup station) or attached undercounter hot cabinets labeled as time control. Most plans provided only the discard times for foods and no set-up times. In the crew galley there were potentially hazardous foods on ice baths at counters on time control, but that method was not listed in the time control plan. Additionally, there were pieces of cooking equipment with various foods inside and time control labels attached, but that equipment was not listed on the time control plan (steam kettles, range tops). Those equipment pieces were not labeled as time control units.None of the bain marie's in galleys, pantries, buffets, or room service were labeled time control and none of the attached warming cabinets below them were labeled time control either.

**Recommendation:** Maintain a written time control plan(s) that ensures compliance with these guidelines on the vessel and make it available for review during inspections. Post a time control plan at each outlet where time control is used. Ensure plan(s): (1) Includes set-up and discard times for each outlet. (2) List refrigeration and hot holding units (compartments and cabinets) on time control (the physical units must also be labeled as such). (3) Describe or show the flow of potentially hazardous food from when last in temperature control to placement in time control and discard.

---

**Item No.:** 16

**Site:** Galley-Main Galley - Appetizer Pantry

**Violation:** The 7-day discard labels for the rigatoni salads stored in the walk-in refrigerator were labeled with production date of 9 October and discard on 15 October, but in the cooling log entries for the rigatoni pasta and cooked vegetable ingredients for this salad they were actually cooked on 8 October and cooling ended by 7 pm that evening. Final preparation of the other ingredients to the salad was on 9 October.

**Recommendation:** Ensure refrigerated, potentially hazardous, ready-to-eat food ingredients or a portion of a refrigerated, potentially hazardous, ready-to-eat food that is subsequently combined with additional ingredients or portions of food retains the date marking of the earliest or first-prepared ingredient.

---

**Item No.:** 16

**Site:** Galley-Main Galley - Appetizer Pantry

**Violation:** The 7-day discard labels for the rigatoni salads stored in the walk-in refrigerator were labeled with production date of 9 October and discard on 15 October, but in the cooling log entries for the rigatoni pasta and cooked vegetable ingredients for this salad they were actually cooked on 8 October and cooling ended by 7 pm that evening. Final preparation of the other ingredients to the salad was on 9 October.

**Recommendation:** Ensure refrigerated, ready-to-eat, potentially hazardous food: (1) Prepared on a vessel and held refrigerated for more than 24 hours is clearly marked at the time of preparation to indicate the date or day by which the food must be consumed (7 calendar days or fewer from the day the food is prepared). The day of preparation is counted as day 1. (2) Prepared and packaged by a food-processing plant and held on the vessel after opening for more than 24 hours must be clearly marked at the time the original container is opened to indicate the date by which the food must be consumed (7 calendar days or fewer after the original container is opened). The day of opening is counted as day 1.

**Item No.:** 20

**Site:** Food Service General-All Food Preparation Areas

**Violation:** The ship's staff were not equipped with sensitive tip food thermometers for measuring temperatures of thin foods.

**Recommendation:** Ensure food temperature-measuring devices are provided and readily accessible for use in ensuring attainment and maintenance of food temperatures. Use tip-sensitive temperature-measuring devices, such as a thermocouple or thermistor, for measuring thin food products.

**Item No.:** 20

**Site:** Dining Room-Deck 2 Starboard Dining Room Pantry

**Violation:** Two of three screws were missing from the Scharf espresso machine where the espresso coffee dispensing head attaches.

**Recommendation:** Replace the missing screws.

**Item No.:** 20

**Site:** Preparation Room-Vegetable Preparation

**Violation:** There were slot-head screws fastened into the interior liner (food-contact surface) for the two potato peelers.

**Recommendation:** Replace slotted fasteners with low-profile hex head fasteners.

**Item No.:** 21

**Site:** Dining Room-Port and Starboard Pantries Decks 2 and 3

**Violation:** The starboard deck 2 pantry had power cables for the coffee and juice machines draped on the counter making cleaning difficult. Power cables were on the counter top behind the bulk milk dispensers and coffee machines in the deck 2 port pantry, and the same behind the deck 3 port side juice dispenser.

**Recommendation:** Shorten or hang power cables so they are not on the counters.

**Item No.:** 21

**Site:** Food Service General-Undercounter Refrigerator Doors

**Violation:** Several undercounter reach-in refrigerator doors had open gaps present along the lower door when shut. The following areas and doors were noted: main galley - appetizer pantry #097 left door, #091 right door, #092 all 3 doors, pastry #081 both doors, deck 6 room service #017 left and right doors, and #024 the far right door.

**Recommendation:** Repair or replace the doors so they seal tight when closed.

**Item No.:** 21

**Site:** Room Service-Deck 6 - Room Service Pantry

**Violation:** Several square black serving trays on the soiled landing counter were heavily damaged along the edges, with exposed metal underlayer visible where the plastic was chipped away.

**Recommendation:** Replace serving trays which are too damaged to repair.

**Item No.:** 22

**Site:** Galley-Main Galley - Dishwash Port

**Violation:** During active use of the flight-type conveyor dishwasher two of the upper arm auxiliary rinse spray nozzles were fully clogged and two others were spraying only weakly. Additionally, the rinse tank temperature was measured at 163 °F, but the mounted digital thermometer displayed a rinse tank temperature of 176 °F.

**Recommendation:** Maintain warewashing equipment in good repair and proper adjustment, including: (1) warewashing equipment is maintained in a state of repair and condition that meets

the standards of the materials, design, and construction of these guidelines; (2) water pressure and water temperature-measuring devices are maintained in good repair and accurate within the intended range of use.

**Item No.:** 22

**Site:** Galley-Main Galley - Dishwash Port

**Violation:** The in-use flight-type conveyor dishwasher had a heavily soiled upper steel panel which was postioned just after the final sanitizing rinse. This panel soil was beyond a day's accumulation.

**Recommendation:** Ensure warewashing machines, drainboards, and the compartments of sinks, basins, or other receptacles used for washing and rinsing equipment, utensils, or raw foods, or laundering wiping cloths are cleaned: (1) before use; (2) throughout the day at a frequency necessary to prevent recontamination of equipment and utensils and to ensure that the equipment performs its intended function; (3) at least every 24 hours (if used).

**Item No.:** 22

**Site:** Room Service-Deck 6 - Room Service Pantry

**Violation:** The in-use conveyor dishwashing machine's rinse compartment upper spray arm nozzles were all producing a dripping water and no spray at all.

**Recommendation:** Maintain warewashing equipment in good repair and proper adjustment, including: (1) warewashing equipment is maintained in a state of repair and condition that meets the standards of the materials, design, and construction of these guidelines; (2) water pressure and water temperature-measuring devices are maintained in good repair and accurate within the intended range of use.

**Item No.:** 22

**Site:** Galley-Lido Galley - Dishwash

**Violation:** The in-use conveyor glasswash machine had a rear upper metal panel, just after the final sanitizing rinse which was heavily soiled with accumulated scale (mineral salts).

**Recommendation:** Ensure warewashing machines, drainboards, and the compartments of sinks, basins, or other receptacles used for washing and rinsing equipment, utensils, or raw foods, or laundering wiping cloths are cleaned: (1) before use; (2) throughout the day at a frequency necessary to prevent recontamination of equipment and utensils and to ensure that the equipment performs its intended function; (3) at least every 24 hours (if used).

**Item No.:** 22

**Site:** Food Service General-Pot Wash Machines

**Violation:** At least three pot wash machines were in significant disrepair in the main galley and room service pantry. Staff were attempting repairs on these and the conveyor machines throughout the inspection and there was a significant accumulation of soiled pots and equipment especially in the main galley.

**Recommendation:** Maintain warewashing equipment in good repair and proper adjustment, including: (1) warewashing equipment is maintained in a state of repair and condition that meets the standards of the materials, design, and construction of these guidelines; (2) water pressure and water temperature-measuring devices are maintained in good repair and accurate within the intended range of use.

**Item No.:** 24

**Site:** Other-Lido - Coffee Shop

**Violation:** The sanitizing solution at this in-use outlet was very cloudy and the free chlorine concentration was below the 10 ppm minimum on the inspector's test strip. The water was discarded immediately.

**Recommendation:** Ensure sanitizing solutions are used with the following concentrations: (1) A

chlorine solution with a concentration between 50 mg/L (ppm) and 200 mg/L (ppm); (2) An iodine solution with a pH of 5.0 or less or a pH no higher than the level for which the manufacturer specifies the solution is effective AND a concentration between 12.5 mg/L (ppm) and 25 mg/L (ppm); (3) A quaternary ammonium compound solution with a concentration as specified in 40 CFR 180.940 Sanitizing Solutions AND as indicated by the manufacturer?s use directions included in the labeling. If another solution concentration or temperature of a chlorine, iodine, or quaternary ammonium compound is used, demonstrate to VSP that the solution achieves sanitization and the use of the solution is approved. If a chemical sanitizer other than a chlorine, iodine, or quaternary ammonium compound is used, ensure it is applied in accordance with the manufacturer?s use directions included in the labeling.

**Item No.:** 27

**Site:** Pantry-Avalon

**Violation:** There was an accumulation of old dark material on the bottom of the paper towel dispensers at the two handwash stations.

**Recommendation:** Ensure non-food-contact surfaces of equipment are kept free of an accumulation of dust, dirt, food residue, and other debris.

**Item No.:** 27

**Site:** Pantry-Lobby

**Violation:** There was an accumulation of dark material on the bottom of the paper towel dispenser at the starboard handwash station.

**Recommendation:** Ensure non-food-contact surfaces of equipment are kept free of an accumulation of dust, dirt, food residue, and other debris.

**Item No.:** 28

**Site:** Galley-Main Galley - Appetizer Pantry

**Violation:** Water was dripping from a heavily mold soiled plastic speaker cover in the deckhead over the aft food preparation counter. The counter was clean and not in use at the time of inspection.

**Recommendation:** Store cleaned equipment and utensils, laundered linens, and single-service and single-use articles: (1) in a clean, dry location; (2) in a location where they are not exposed to splash, dust, or other contamination; (3) at least 150 millimeters (6 inches) above the deck.

**Item No.:** 29

**Site:** Bar-Starboard Avalon Pool Bar

**Violation:** The handwash in this area was blocked by 2 trash bins. The trash bins were moved. This area was in active use at the time of the inspection.

**Recommendation:** Ensure handwashing facilities are used for no other purpose and are accessible at all times.

**Item No.:** 33

**Site:** Buffet-Staff Mess

**Violation:** The deckhead attached light fixtures were loose from the deckhead as were many deckhead panels over the buffet line and adjacent beverage station, making the area difficult to clean.

**Recommendation:** Ensure decks, bulkheads, and deckheads in food preparation, warewashing, pantries, bars, and food and equipment storage areas are constructed and maintained for easy cleaning. Do not use carpet in these areas.

**Item No.:** 33

**Site:** Buffet-Staff Mess

**Violation:** The deckhead attached light fixtures were loose from the deckhead as were many deckhead panels over the buffet line and adjacent beverage station, making the area difficult to clean.

**Recommendation:** Ensure light fixtures, vent covers, and similar equipment attached to the bulkheads or deckheads are easily cleanable.

---

**Item No.:** 36

**Site:** Buffet-Staff Mess

**Violation:** Several lights in the deckhead over the buffet and beverage station adjacent were not working.

**Recommendation:** Ensure the light intensity is at least 220 lux (20 foot candles) on food preparation surfaces, and at a distance of 75 centimeters (30 inches) above the deck in food preparation areas, handwashing facilities, warewashing areas, equipment, and utensil storage, pantries, toilet rooms, and consumer self-service areas.

---

**Item No.:** 39

**Site:** Dining Room-Deck 2 Starboard Dining Room Pantry

**Violation:** One live filth fly was observed on the bulkhead behind the soup bain marie. The pantry was not in active use at the time of inspection.

**Recommendation:** Effectively control the presence of insects, rodents, and other pests to minimize their presence in the food storage, preparation, and service areas and warewashing and utensil storage areas aboard a vessel.

---

**Item No.:** 39

**Site:** Dining Room-Deck 2 Port Dining Room Pantry

**Violation:** Three live fruit flies were observed at the bulk milk dispenser and the near the ice/water dispenser. The pantry was not in active use at the time of inspection.

**Recommendation:** Effectively control the presence of insects, rodents, and other pests to minimize their presence in the food storage, preparation, and service areas and warewashing and utensil storage areas aboard a vessel.

---

**Item No.:** 39

**Site:** Dining Room-Deck 3 Port Dining Room Pantry

**Violation:** One live fruit fly was observed inside the walk-in refrigerator labeled menu room. Another live fruit fly was observed at the bulk milk dispenser. The pantry was not in active use at the time of inspection.

**Recommendation:** Effectively control the presence of insects, rodents, and other pests to minimize their presence in the food storage, preparation, and service areas and warewashing and utensil storage areas aboard a vessel.

---

**Item No.:** 41

**Site:** Housekeeping-Restrooms

**Violation:** There were no signs advising users of the toilet facilities to use hand towel, paper towel, or tissue to open the door. However, there were paper tissue dispensers on the bulkhead next to the exit doors.

**Recommendation:** Post a sign advising users of toilet facilities to use hand towel, paper towel, or tissue to open the door unless the exit is hands free.

---

**Item No.:** 43

**Site:** Ventilation-Air Handling Units

**Violation:** The water used for the cleaning of air handling units was technical water.

Inspection Detail Report                                                                                                    10/16/12 9:22 PM

**Recommendation:** Use only potable water for cleaning HVAC distribution systems.

*Inspections scores of 85 or lower are NOT satisfactory*

---

Page last reviewed: January 06, 2010
Page last updated: January 06, 2010
Content source: <u>National Center for Environmental Health</u>

---

Centers for Disease Control and Prevention  1600 Clifton Rd. Atlanta, GA 30333,
USA
800-CDC-INFO (800-232-4636) TTY: (888) 232-6348, 24 Hours/Every Day –
<u>cdcinfo@cdc.gov</u>



## ATTACHMENT THREE

## THE CARNIVAL WEB PAGE THE PUBLIC IS SENT TO, WHEN THEY CLICK ON THE CARNIVAL CRUISE TICKET CONTRACT TERMS LINK, AT CARNIVAL'S INTERNET WEB SITE



Welcome back,   Billy       Not Billy

1.800.764.7419

COMMUNITY    HELP    Search Carnival.com

BEFORE YOU BOOK
your cruise

EXPLORE
Carnival cruising

MANAGE
my cruise

SPECIAL
offers

the VIFP Club



## HOW DID YOU GET HERE?

We're sorry the page you're looking for cannot be found.

There may be a mis-spelling in the URL entered, or the page may no longer exist.

Redfrog Pub is Carnival's laid-back, no-worries, British-West-Indies-meets-Key-West-style bar.

| Already Booked | Book A Cruise | Group Travel | Special Offers | Customer Service | About Carnival |
|---|---|---|---|---|---|
| Manage My Cruises | All About Cruising | Contact A Group Planner | All Specials | Carnival FAQs | News |
| Airport Transfers | Booking Options | Group Shore Excursions | Close-To-Home Cruises | Contact Us | Press/Media |
| Gifts & Services | Specials | Charters, Meetings & Incentives | Early Saver Specials | Cruise Reviews | St Jude |
| Hotel Packages | Find a Travel Agent | Weddings & Occasions | VIFP Club Offers | Support Forums | Carnival Foundation |
| | Vacation Protection | | Carnival Australia | Embarkation Information | Safety Policy |
| | | | | Guests With Special Needs | Sustainability |
| | | | | Cruise Ticket Contract Terms | Investor Relations |
| | | | | | World's Leading Cruise Lines |

About Carnival    Legal Notices    Privacy Policy    Careers    Press / Media    Travel Partners

**FUN FOR ALL. ALL FOR FUN.®**    



terms and conditions

Billy Kidwell
5064 Silver Bell Drive
Port Charlotte, FL. 33948

October 16, 2012

Clerk of Court, 8th Floor

United States Courthouse

400 North Miami Avenue

Miami, Florida 33128


Dear Clerk of Court,

Pursuant to our phone conversation please find enclosed;

1. 1 Civil Cover Sheet.
2. 1 Pro Se Civil Complaint
3. 1 check for $350 payable to the Clerk of Court.

Can you please call me, Billy Kidwell, at 941 627-0433 and advise me when this lawsuit has been filed, and provide me with the docket number.

Thanks for your kind assistance in this matter,


Respectfully Submitted,

Billy Kidwell


Copy : File

1